UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

WENDY FREYTES,                                          :

                 Plaintiff,                      :        <u>OPINION AND ORDER</u>

           -against-                            :        14 Civ. 5662 (GWG)

COMMISSIONER OF SOCIAL SECURITY,        :

             Defendant.                   :

----------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Wendy Freytes brings this action under 42 U.S.C. §§ 405(g) and 1383(c) for

judicial review of the final decision of the Commissioner of Social Security denying her claims

for Social Security Disability ("SSD") and Supplemental Security Income ("SSI") benefits under

the Social Security Act.  The parties have consented to disposition of this case by a United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Both Freytes and the Commissioner have

moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons stated

below, Freytes's motion is granted, the Commissioner's motion is denied, and the case is

remanded for further proceedings.

I.       <u>BACKGROUND</u>

A.       <u>Freytes's Claim for Benefits and Procedural History</u>

Freytes applied for SSD and SSI benefits on June 7, 2011.  <u>See</u> SSA Administrative

Record, filed Dec. 1, 2014 (Docket # 11) ("R."), at 102-13.  She claimed that her ability to work

was limited by "major depressive disorder" and "chronic knee pain[]."  R. 172.  The alleged

onset date of her disability was April 5, 2010.  R. 102, 104.

On August 25, 2011, the Social Security Administration denied Freytes's application.  R. 49-55.  Freytes requested a hearing before an Administrative Law Judge ("ALJ"), R. 57-59, which was held on October 23, 2012, R. 24-46.  On January 9, 2013, the ALJ issued a decision concluding that Freytes was not disabled.  R. 9-20.  Freytes requested review of this decision from the Appeals Council, R. 7-8, which denied her request, R. 1-6, making the ALJ's decision the final decision of the Commissioner.  On July 24, 2014, Freytes filed this suit under 42 U.S.C. §§ 405(g) and 1381(c).  See Complaint, filed July 24, 2014 (Docket # 1).  Both parties have filed motions for judgment on the pleadings.[1]

B.      The Administrative Record

Freytes and the Commissioner have each provided a summary of the relevant evidence contained in the administrative record.  See Pl. Mem. at 2-9; Comm'r Mem. at 2-14.  The Court adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit.  We discuss the portions of the administrative record pertinent to the adjudication of this case in section III below.

C.      The Hearing Before the ALJ

A hearing before ALJ James Kearns was held on October 23, 2012.  R. 24-46.  Freytes appeared in person and was represented by an attorney.  R. 24, 26.  Freytes testified that she traveled to the hearing by taxi with her father-in-law.  R. 29, 37.  The ALJ heard testimony from Freytes and vocational expert Yaakov Taitz, Ph.D.  R. 24-25; see R. 80-81.

---

[1]  See Notice of Motion for Judgment on the Pleadings, filed Dec. 29, 2014 (Docket # 14); Memorandum on Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed Dec. 29, 2014 (Docket # 15) ("Pl. Mem."); Notice of Motion, filed Feb. 27, 2015 (Docket # 18); Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of Defendant's Cross-Motion for Judgment on the Pleadings, filed Feb. 27, 2015 (Docket # 19) ("Comm'r Mem.").

Freytes testified first, responding to questions from the ALJ and then her attorney. She was born on May 22, 1977, R. 27, making her 35 years old as of the hearing date. She completed 10th or 11th grade but did not graduate from high school or receive any vocational training. R. 29. She lives with her three children — aged 10, 3, and 1 — and her boyfriend. R. 28. The last time she worked was 2010, at which time she was working full-time from her home as a babysitter. R. 29-30. She had been working as a babysitter since 2007 and could not recall what work she did before that. R. 30.

Asked about why she was unable to work, Freytes mentioned depression, anxiety attacks, poor concentration, and side effects from her medication including dizziness and drowsiness. R. 31. She also stated that she hears voices, which she described as "[d]istant voices, mumbling." R. 39. As for physical problems, she stated that she was diagnosed with "chondromalacia patellae" of her knees and that she had not attended physical therapy for that condition because she was afraid to go and did not have anyone to accompany her. R. 36. Her knees still hurt "from time to time," but she was not seeing a doctor about them as of the date of the hearing. Id. She stated that she saw a psychiatrist each month and that she regularly saw her primary care physician. See R. 31-32. She confirmed that she was currently taking Clonazepan, Invega, Gabapentin, and Escitalopram. R. 32. She testified that the medications "work from time to time" but that they made her "sleep most of the day." R. 33.

Freytes testified that, during a typical day, she spends most of her time asleep, except she is awake to eat breakfast and lunch and she "say[s] . . . hello to my little kids." Id. She stated that her boyfriend takes care of her children when she is "not capable of doing it," id., and that her boyfriend's mother also comes to her house to help with the children when he is not there, R. 35. Freytes testified that her boyfriend does all the cooking and that she does not cook. R. 34-

3

35.  Her boyfriend also does the mopping, sweeping, and laundry, but Freytes "clean[s] up [her] bed."  R. 35-36.  Her daughter does the dishes.  R. 35.  Freytes leaves the house to attend appointments for herself or her children and to go food shopping with her boyfriend.  R. 34-35.  She travels by bus or taxi when she needs to get somewhere, and someone always travels with her.  R. 29, 37.  She cannot use the train because "it's too much people" and her "heart races and I get sick."  R. 37.

Freytes testified that her psychological symptoms began when she was young.  R. 38.  She attempted suicide twice, with the latest attempt being in 2001.  Id.  She testified that she had a brother who was schizophrenic and that her father and grandmother had similar problems.  R. 40.

Next, the ALJ heard testimony from the vocational expert.  The expert testified he had read the record of Freytes's work history and listened to her testimony.  R. 43.  He stated that Freytes's previous job as a babysitter was of medium exertion level.  Id.  The ALJ asked the expert to assume a hypothetical individual with that past job who is capable of light exertion and could only perform simple and repetitive tasks with occasional interaction with the public, coworkers, and supervisors.  R. 44.  The expert stated that such a person could not perform the job of babysitting.  Id.  However, he indicated that the following other light exertion level jobs would be available: cafeteria attendant (5,000 jobs in the region and 391,000 nationally); photocopy machine operator (1,800 jobs in the region and 66,000 nationally); and mail clerk (2,500 jobs in the region and 115,000 nationally).  The ALJ asked the expert to consider an individual with the same characteristics who was "off task for 15 percent of the day."  Id.  The expert responded that in this situation, there would be no job available for that person.  Id.

> D.    The ALJ's Decision

The ALJ found that Freytes was not disabled in a decision issued on January 9, 2013.

R. 9-20.  After discussing the applicable law, see R. 12-14, the ALJ found that Freytes had not

engaged in substantial gainful activity since April 5, 2010, the alleged onset date of her

disability, R. 14.  He also found that Freytes had the "severe impairments" of "depression, panic

disorder with agoraphobia, and generalized anxiety disorder."  Id. (citing 20 C.F.R.

§§ 404.1520(c), 416.920(c)).  He noted that Freytes had "a history of anemia, asthma, and knee

pain" but stated that "the record demonstrates that these impairments do not cause significant

limitations" in Freytes's "ability to perform basic physical or mental work activities."  Id. (citing

20 C.F.R. §§ 404.1521, 416.921).  The ALJ explained that this was based on the fact that

Freytes's asthma was "classified as 'under control,'" her respiratory examination on September

13, 2011 was "normal" with "no wheezing," and her anemia did not cause functional limitations

and responded to her current medications.  R. 15 (citations omitted).  Additionally, with respect

to Freytes's knee pain, the ALJ noted that June 20, 2011 x-rays "showed no acute fracture,

dislocation, or significant joint space abnormality," though they did show "some

demineralization."  Id. (citation omitted).  Also, at the consultative examination, Freytes had

"normal gait, a full range of motion in her knees, and 5/5 strength in her lower extremities,"

similar to a November 8, 2011 examination at which she had "a normal gait[] and a full range of

motion with pain at extreme flexion."  Id.  The ALJ noted that Freytes had been prescribed

NSAIDs as needed for her "chondromalacia patella," but that she had twice reported being

physically able to complete the activities of daily living.  See id. (citations omitted).  Therefore,

these physical impairments were found to be "not severe."  R. 14.

The ALJ next found that Freytes did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 15 (citing 20 C.F.R. §§ 404.1520(d), 404.1525-.1526, 416.920(d), 416.925-.926).  He noted that to satisfy the "paragraph B" criteria of listings 12.04 and 12.06, a claimant's mental impairments must result in at least two of: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."  Id.  The ALJ found that Freytes had only moderate restriction in her activities of daily living, because she "takes care of her two small kids on a daily basis, watches TV," and was unable to mop or wash dishes only "because her back hurts."  Id.  He also found that Freytes had only moderate difficulties in social functioning — though he acknowledged that Freytes stated she only leaves the house for appointments, has panic attacks, and cannot take the subway, he also noted that Freytes lives with her boyfriend, talks to friends who help her leave the house alone by remaining on the phone with her, and goes to her mother-in-law's house with her children.  R. 15-16; see R. 17.  The ALJ also found that Freytes had only moderate difficulties in concentration, persistence, or pace.  R. 16.  This was based on her testimony that she "has poor concentration[,] . . . forget[s] things, and has trouble finishing what she starts" but "can follow spoken and written instructions," as well as the consultative examiner's finding that Freytes has "impaired attention and concentration and mildly impaired recent memory."  Id. (citation omitted).  The ALJ remarked that there was no evidence that Freytes had experienced any episodes of decompensation for an extended duration.  Id.  He also found that there was no evidence that the "paragraph C" criteria for anxiety-related disorders were satisfied.  See id.

6

Next, the ALJ found that Freytes had "the residual functional capacity to perform a full range of work at all exertional levels" with the nonexertional limitation that she was "limited to simple and repetitive tasks only, with only occasional interaction with the public, coworkers, and supervisors." Id.  The ALJ stated that, in making this finding, he followed the two-step process of first determining "whether there is an underlying medically determinable physical or mental impairment(s)" that could reasonably be expected to produce Freytes's symptoms; and second, evaluating "the intensity, persistence, and limiting effects" of those symptoms "to determine the extent to which they limit [Freytes's] functioning." R. 16-17.  At the first step, the ALJ found that Freytes's medically determinable impairments could reasonably be expected to cause her alleged symptoms. R. 17.

However, at the second step, he found that Freytes's statements about the intensity, persistence, and limiting effects of those symptoms were "not entirely credible." Id.  The ALJ explained that this was because Freytes received no psychiatric treatment for 15 months after the alleged onset of her disability; her mental status examinations showed her to be alert, "oriented times three," friendly, and cooperative, with good eye contact, some insight, fair judgment, and fair impulse control; and her symptoms had "improved on medication." Id. (citations omitted). The ALJ noted that a medical source statement form completed by Freytes's treating physician, Dr. Paul Rosen, on September 21, 2012, stated that Freytes would have "a marked loss in her ability to carry out substantially all mental activities required for full time work," but the ALJ gave this opinion "little weight" because it was "contradictory" and belied by Dr. Rosen's own treatment notes, which indicated that Freytes "was doing well on medication." R. 18 (citations omitted).  Additionally, the ALJ stated that Freytes's July 18, 2011 psychiatric consultative examination with Howard Tedoff, Ph.D., showed her to be "cooperative," with an "adequate"

7

manner of relating, social skills, and overall presentation; "normal" speech and thought
processes; "full range and appropriate" affect; and "fair" insight and judgment.  Id.  She was
"below average" in cognitive functioning, "impaired" in attention and concentration, and "mildly
impaired" in recent memory.  Id.  Dr. Tedoff diagnosed Freytes with a learning disorder,
depressive disorder, and anxiety disorder, but he opined that she could "follow and understand
simple directions and instructions and perform simple tasks independently," "relate adequately
with others," and could "maintain at least a part-time schedule in some work areas."  Id.  The
ALJ gave this opinion "some weight" because Dr. Tedoff examined Freytes and is a specialist in
the field of psychology.  Id.  However, he gave Dr. Tedoff's diagnosis of a learning disorder
"little weight" because there was no indication in the record that Freytes has cognitive
difficulties.  Id. (citation omitted).  As for the state agency psychological consultant Dr. T.
Harding, who opined that Freytes has "mild restriction of activities of daily living" and
"moderate difficulties" in maintaining social functioning, concentration, persistence, or pace, the
ALJ gave "some weight" to that opinion.  Id.  This was because Dr. Harding is a specialist in the
field of psychology, but he "did not see the majority of [the] evidence from the treating source."
Id. (citations omitted).[2]  The ALJ gave "little weight" to Dr. Harding's opinion about Freytes's
physical impairments because her asthma is not severe, she did not allege any limitation of her
left hand, and she has a "full range of motion" despite her knee pain.  R. 18-19.  Summing up his
findings on this point, the ALJ stated that the objective medical evidence showed that Freytes's
physical symptoms were not proven to be severe, and her psychological symptoms improved on
medication.  R. 19.  Her difficulties in concentration and memory were accounted for with the

---

[2]  Plaintiff asserts that there are "no credentials in the record" for Dr. Harding, Pl. Mem.
at 6, but the record indicates that he holds a Ph.D.  R. 47-48.

limitation to simple work in the ALJ's residual functional capacity assessment, and her anxiety and agoraphobia were accounted for with the social restrictions in that assessment.

The ALJ further found that Freytes was defined as a "younger individual age 18-49" on the alleged onset date and that she had "a limited education" and was "able to communicate in English." Id.  The ALJ found that Freytes was unable to perform her past relevant work, but considering Freytes's age, education, work experience, and residual functional capacity, he found that there were jobs that existed in the national economy that she could perform.  Id.  He noted that Freytes was able to perform work at all exertional levels but had some nonexertional limitations.  See R. 19-20.  The ALJ stated that he asked the vocational expert "whether jobs exist in the national economy for an individual with [Freytes's] age, education, work experience, and functional capacity" to determine the extent to which those nonexertional limitations "erode[d] the occupational base of unskilled work at all exertional levels" that Freytes could perform.  R. 20.  The ALJ noted that the vocational expert identified the jobs of cafeteria attendant, photocopy machine operator, and mail clerk, all of which were classified as "light work."  Id.  Based on this testimony, and considering Freytes's age, education, work experience, and residual functional capacity, the ALJ found that Freytes was "not disabled" under the relevant sections of the Social Security Act.  Id. (citations omitted).

II.     APPLICABLE LAW

        A.      Scope of Judicial Review Under 42 U.S.C. §§ 405(g) and 1383(c)

        A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117,

127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); see McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citations and internal quotation marks omitted).

10

"The role of the reviewing court is therefore 'quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (quoting Hernandez v. Barnhart, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007)).

      B.      Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1, 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process) (citations omitted). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not

engaged in substantial gainful activity, the Commissioner must decide if the claimant has a

"severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which

is an impairment or combination of impairments that "significantly limits [the claimant's]

physical or mental ability to do basic work activities," id. § 404.1520(c).  Third, if the claimant's

impairment "meets or equals" the severity of one of the listings in 20 C.F.R. Part 404, Subpart P,

Appendix 1, and "meets the duration requirement," the claimant must be found disabled.  Id.

§ 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment does not meet or equal one of the

listed impairments, or does not meet the duration requirement, the Commissioner must review

the claimant's residual functional capacity to determine if the claimant is able to do the work he

or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is

able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform

past relevant work, the Commissioner must decide if the claimant's residual functional capacity,

in addition to his or her age, education, and work experience, permit the claimant to do other

work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be

deemed disabled.  Id.  The claimant bears the burden of proof on all of these steps except the

final one — that is, proving that there is other work the claimant can perform.  See Cichocki v.

Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (quoting Burgess, 537 F.3d at 128).

III.     DISCUSSION

    A.     The Side Effects of Freytes's Medications

    Freytes complains that the ALJ did not consider the side effects of her medications.  See

Pl. Mem. at 17.  At the hearing before the ALJ, Freytes testified that although her medications

"work from time to time," they make her drowsy, so that she sleeps for most of the day.  R. 31,

33.  The ALJ's decision did not directly address this testimony.  The ALJ noted that Freytes's

condition "improved on medication," R. 17, but he did not discuss the side effects of the medication.  He stated that Freytes's testimony regarding "the intensity, persistence and limiting effects" of her symptoms was "not entirely credible," and he mentioned that Freytes testified that she "sleeps a lot due to her medications" and "stays in be most of the day."  Id.  However, the ALJ did not explain why Freytes's statements concerning the side effects of her medication — particularly Freytes's assertion that her medication causes her to sleep for much of the day — were not credible.

In determining whether a claimant is disabled, in addition to objective medical evidence, the ALJ is required to consider factors relating to a claimant's symptoms, including "[t]he type, dosage, effectiveness, and side effects of any medication" the claimant takes to alleviate pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(vi).  A ruling by the SSA requires an ALJ to state "specific reasons" for his findings regarding a claimant's credibility, which should be "supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96–7P, 1996 WL 374186, at *4 (July 2, 1996); see Verdaguer v. Colvin, 2013 WL 6426931, at *10 (S.D.N.Y. Dec. 9, 2013) (where the ALJ did not discuss the claimant's medications in his decision, the court "cannot conclude that the ALJ's credibility determination was supported by substantial evidence").

We conclude that the ALJ did not adequately address Freytes's testimony about the side effects of her medications — in particular, that they caused her to stay in bed for most of the day.  See R. 31, 33.  While the ALJ noted that Freytes's condition seemed to improve with

13

medication, see R. 17, this statement does not address the claimed side effects of the medication. Because the ALJ found that Freytes's statements on this point were not credible, he must give "specific reasons" for that finding.  No such reasons are discernable from the ALJ's decision. Accordingly, we must remand the case for further proceedings.

B.      Other Issues on Remand

Freytes raises several other issues with respect to the ALJ's decision, some of which the ALJ may wish to address on remand.

First, Freytes notes that on September 21, 2012, her treating psychiatrist, Dr. Rosen, completed a psychiatric assessment in which he indicated that her "GAF score" was 40.[3]  See Pl. Mem. at 3, 11-12 (citing R. 327-31).  In his decision, the ALJ referenced this assessment, discussing Dr. Rosen's opinion that Freytes "would have a marked loss in her ability to carry out substantially all mental activities required for full time work, essentially stating that she cannot work."  R. 18.  The ALJ gave this opinion "little weight" because he found it to be contradicted by Dr. Rosen's own treatment notes, which indicated Freytes was "doing well on medication." Id.  The ALJ's decision does not, however, mention the low GAF score assigned by Dr. Rosen in this assessment.  On remand, the ALJ may wish to specifically address Dr. Rosen's assessment of a GAF score of 40.

_____

[3]  "GAF" stands for Global Assessment of Functioning, a scale last used in the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") that reports an individual's "psychological, social, and occupational functioning" and was viewed as "particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).  A GAF score of 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant;" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  Id. at 34.  The latest edition of the DSM, the fifth edition, no longer includes GAF scores.  See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

14

Second, Freytes points out that the ALJ gave "some weight" to the opinion of Dr. Harding, the state agency psychologist.  See Pl. Mem. at 15 (citing R. 18); see also R. 194-207 (Psychiatric Review Technique completed by Dr. Harding on August 22, 2011); R. 279-81 (Mental Residual Functional Capacity Assessment completed by Dr. Harding that same day). The ALJ indicated that this was because Dr. Harding is a specialist in psychology and had reviewed Freytes's medical record, but he had not seen "the majority of evidence from the treating source."  R. 18.  While it is not required, to the extent that it might be helpful on remand, the ALJ may wish to obtain the opinion of a consultative examiner, be it Dr. Harding or someone else, who has reviewed Freytes's entire record.[4]

Finally, Freytes objects to the ALJ's questioning of the vocational expert.  See Pl. Mem. at 16-17.  "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion . . . and accurately reflect the limitations and capabilities of the claimant involved . . . ."  E.g., McIntyre, 758 F.3d at 151 (internal citations, quotation marks, and alteration omitted).  Here, the ALJ's decision represented that he "asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity."  R. 20.  But the transcript of the hearing testimony shows that the hypothetical questions posed to the expert did not refer to Freytes's age or education.  See R. 43-44.  On remand, the ALJ should take appropriate action to resolve this inconsistency.

---

[4] We note that the ALJ also considered the opinion of Dr. Tedoff, who conducted a psychiatric consultative examination with Freytes on July 18, 2011, before Freytes began seeing her treating psychiatrist, Dr. Rosen.  See R. 18, 250-51, 303-06, 396-97.

IV.    CONCLUSION

For the reasons explained above, the Commissioner's motion (Docket # 18) is denied,

and Freytes's motion (Docket # 14) is granted.  The case is remanded for further proceedings

consistent with this Opinion and Order.

SO ORDERED.

Dated: July 9, 2015
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

16